# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RICHARD CARTER *et al.*,

       *Plaintiffs*,

   v.

URBAN SERVICE SYSTEMS
CORPORATION *et al.*,

       *Defendants.*

Civil Action No. 18-643 (RDM)

## MEMORANDUM OPINION

This case raises the question whether a party to a stock purchase agreement and corresponding promissory note and security agreement may decline to make payments due under those agreements based on a defense of fraudulent inducement, while simultaneously affirming the stock purchase agreement and treating the acquired stock as his own. As explained below, the Court concludes that, at least in the circumstances of this case, he may not do so, and that his remedy for fraudulent inducement lies, if at all, in an action for damages.

The parties to this action are Plaintiffs Richard and Jonita Carter, who were the sole shareholders in Urban Service Systems Corporation ("Urban Systems") prior to the transaction at issue, and Defendants Urban Systems and William Keating. In 2016, the Carters decided to retire, and they agreed to sell their interest in Urban Systems to Keating. But because Keating lacked the funds to purchase the company outright, the sale was made, in effect, on credit. Richard Carter returned all of his shares to Urban Systems in exchange for a promise, secured by those shares, that Urban Systems would make monthly payments to him over a period of almost five years, for a total of $1,032,246. Jonita Carter also returned most of her shares to Urban

Systems on similar terms requiring monthly payments totaling $137,175, and she sold her remaining shares to Keating in return for a promise, again secured by the corresponding shares, that Keating would pay her $68,579, plus interest, over a similar period of time.  Pursuant to these agreements, Keating would become the sole shareholder in Urban Systems; Urban Systems would pay the Carters the bulk of the purchase price from the company's profits over a period of about five years; and Keating would acquire the company, along with its new debt to the Carters, for $68,579.  In theory, all would gain from the transaction.  The Carters would receive $1,238,000 for the company, and Keating would acquire the company for a relatively modest upfront amount.

That theory, however, turned on the assumption that the company would earn a substantial profit on its sole contract, which was with the District of Columbia Water and Sewer Authority ("D.C. Water").  When it failed to do so, the company and Keating stopped making the required payments to the Carters.  The Carters, in response, eventually notified Urban Systems and Keating that they were in default under the promissory notes, and the Carters exercised their rights under the security agreements to demand the return of their shares.  When Urban Systems and Keating failed to cure their defaults or to return the stock, the Carters commenced this action.  Subsequently, they moved for a preliminary injunction, seeking to compel Urban Systems and Keating to return their shares.

With the agreement of the parties, the Court consolidated Plaintiffs' motion for a preliminary injunction with briefing and argument on summary judgment, set a further briefing schedule, and held a hearing on the consolidated motions.  Urban Systems and Keating answered the Carters' motions, and Keating filed counterclaims against the Carters alleging fraudulent inducement and negligent misrepresentation.  Neither Urban Systems nor Keating disputes the

Carters' allegations of nonpayment of the amounts specified in the payment schedules. They do, however, dispute that Plaintiffs are entitled to relief, arguing that Richard Carter fraudulently induced Keating to enter into the transaction by misrepresenting the profitability of Urban Systems' D.C. Water contract. According to Keating, he is the injured party; neither he nor Urban Systems should be required to return the shares; and the Carters are liable to him for compensatory damages. Finally, Urban Systems and Keating contend that, in any event, the entry of a preliminary injunction or summary judgment is premature because they have not yet had the opportunity to conduct discovery relating to their fraudulent inducement and negligent misrepresentation defenses.

As explained below, the Court agrees that it is premature to resolve Keating's counterclaims. That does not mean, however, that it is premature to decide whether the Carters are entitled to the return of their shares under the promissory notes and security agreements. Those agreements are clear: The promissory notes are payable "without offset," and, in the event of a default, Urban Systems and Keating agreed to return the shares to the Carters. To be sure, fraudulent inducement may, at times, provide a basis for rescinding a contract. But the party asserting fraudulent inducement must elect either to rescind the contract—which, here, would result, among other things, in the return of the shares to the Carters—or to affirm the contract and to sue for damages. Although Keating would like to have it both ways, he is not entitled to do so; he cannot affirm the portion of the contract that grants him ownership of Urban Systems, while disaffirming the portion that requires that he and Urban Systems make monthly payments to the Carters. Having continued to exercise control of Urban Systems to this day, his sole recourse is to return the shares, as required by the agreements, and then, if appropriate, to sue for damages.

The Court will, accordingly, grant partial summary judgment in favor of Plaintiffs and deny Plaintiffs' motion for a preliminary injunction as moot.

## I. BACKGROUND

For purposes of resolving Plaintiffs' motion for partial summary judgment, the Court takes "the facts in the record and all reasonable inferences derived therefrom in the light most favorable" to Defendants. *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)).

### A.    Negotiations

Plaintiffs Richard and Jonita Carter are the former owners and operators of Urban Systems, a waste collection, disposal, and processing company. Dkt. 11-18 at 2 (Carter Decl. ¶ 3). In February 2016, Richard Carter (hereinafter "Carter") proposed to sell Urban Systems to Defendant William Keating, Dkt. 20 at 113–14, who had served as President of the company from 2005 to 2013, *id.* at 85. Because Keating lacked the capital to purchase the company outright, Carter suggested that Urban Systems fund the bulk of the purchase price from the company's future profits on its contract with D.C. Water. *Id.* at 114 ("[Carter] said that the [company's] contract would . . . pay the cost of the purchase and still have some profit remaining."). That contract—known as the Grit Contract—dated back to approximately 2005 and was Urban Systems' sole existing contract (and source of revenue) at the time of the negotiations and sale. *Id.* at 13, 63–64; Dkt. 14-1 at 1 (Keating Decl. ¶¶ 3–5).

Under the Grit Contract, Urban Systems disposed of heavy solid materials—or "grit"—removed from wastewater on behalf of D.C. Water. *Id.* (Keating Decl. ¶ 3); Dkt. 20 at 12–13. The company picked up the grit from D.C. Water's wastewater treatment plant and transported it to a disposal site, and, in return, received a per-ton fee. Dkt. 20 at 74. Given the nature of the contract, however, both the revenue and costs were subject to fluctuation. *Id.* at 18. Because

Urban Systems was paid on a per-ton basis, the revenue varied based on the amount of grit generated each month. *Id.* at 74. Likewise, Urban Systems' costs—and, in particular, its disposal costs—also varied. *Id.* at 28. As Eunice Liu, the company's former comptroller, explained, different disposal sites charged different amounts; those that are further away from the District of Columbia charged less for disposal, but travel to those more distant sites resulted in larger transportation costs. *See id.* at 95. Urban Systems negotiated separate per-ton disposal rates with the various disposal sites. *Id.* at 88.

According to Keating, when Carter proposed in February 2016 that Keating purchase Urban Systems, Carter represented that the Grit Contract would generate sufficient profits to cover the purchase price, while still leaving some return for Keating. *Id.* at 114; Dkt. 14-1 at 1 (Keating Decl. ¶ 5) ("Mr. Carter represented to me that he would submit . . . a bid for the [c]ontract at sufficient profit margins to enable the [c]ompany to pay him approximately $1 million in monthly increments of approximately $20,000 over a period of approximately five years."). Carter backed this representation up with a spreadsheet, which he asked Liu to send to Keating, "reflect[ing] the expenses and . . . [profit] margins associated with servicing the [c]ontract." *Id.* at 2 (Keating Decl. ¶ 11). The spreadsheet, which is captioned "Grit Hauling Cost Proposal," includes a separate page for each of the five years of the contract. *See* Dkt. 17-1. Each page includes a series of costs, including driver wages, payroll taxes, fringe benefits, fuel, registration, insurance, repairs, and maintenance. Dkt. 17-1 at 2–6. Most significantly, the spreadsheet reflects the proposed weekly, monthly, and annual disposal costs at an initial rate of $18.50 per ton and growing by approximately 3% each year of the contract. *Id.*; Dkt. 20 at 28. The projected disposal cost was, by far, the largest cost included in the spreadsheet, and the profitability of the contract turned on managing that significant cost. *See* Dkt. 17-1 at 2–6; Dkt.

20 at 28 ("Th[e] [landfill rate] is the single most [important] line item in bidding this contract in order for it to be profitable."); *id.* at 93 (explaining that the $18.50 per ton landfill rate indicated that "th[e] contract [would] be very profitable"). Notably, the spreadsheet also projected that an alternative disposal site would charge $55.00 per ton, Dkt. 17-1 at 2–4, and Carter conceded in his testimony that the Grit Contract would be a losing proposition at that rate, Dkt. 20 at 77. The spreadsheet, however, projected that all of the grit would go to the less expensive site, known as the King & Queen Landfill. *See* Dkt. 17-1 at 2–6; Dkt. 20 at 77, 123.

Carter and Keating had several follow-up meetings at which they negotiated the terms of the sale. During one meeting in March 2016, Keating presented Carter with his own spreadsheet of projected costs and revenue, which "reflected [the profit] margins [from] the spreadsheet Mr. Carter had Eunice Liu send to [Keating], along with additional details and assumptions," and Keating "asked [Carter] to confirm . . . the accuracy of the cost assumptions and revenue margins." Dkt. 14-1 at 3 (Keating Decl. ¶¶ 15–16). In their conversations about that spreadsheet, Carter did not "at any point tell" Keating "that the costs that he assumed . . . were inaccurate." Dkt. 20 at 71. By April 2016, Carter and Keating reached an agreement for the sale of Urban Systems. Dkt. 11-18 at 3 (Carter Decl. ¶ 4).

## B. Agreements

The sale of Urban Systems was accomplished through a series of agreements. The first agreement—the Stock Purchase and Redemption Agreement ("Purchase Agreement")—set forth the overall structure and terms of the transaction. Dkt. 11-3. Under that agreement, Urban Systems redeemed all of Richard Carter's shares in exchange for a promise to pay him $1,032,246, and it redeemed roughly two-thirds of Jonita Carter's shares in exchange for a promise to pay her $137,175. *Id.* at 3. Keating, in turn, agreed to purchase Jonita's remaining shares, representing all of the outstanding post-acquisition shares of the company, in exchange

for a promise to pay her an additional $68,579. *Id.* at 2–4. To ensure payment of the agreed-upon amounts, Urban Systems further agreed to execute a note promising to pay Richard Carter the principal amount of $1,032,246, and to execute a second note promising to pay Jonita Carter the principal amount of $137,175. *Id.* at 3. The company also agreed to grant the Carters security interests in their respective redeemed shares as collateral for those payments and to enter into corresponding security agreements. *Id.* at 3–4. Keating, likewise, agreed to enter a note promising to pay Jonita Carter the principal amount of $68,579, to grant her a security interest in the shares he acquired under the agreement, and to enter into a corresponding security agreement. *Id.* at 3.

The Purchase Agreement also specified the source of funding for the amounts payable under the promissory notes and provided a further guarantee of payment. Recognizing that the Grit Contract was the company's sole source of revenue, the agreement specified that the payments due under the promissory notes would come from the revenue generated by the Grit Contract and that Urban Systems would establish an escrow account "with its primary banking institution to ensure that the appropriate amount of payments under the [Grit] contract [were] deposited into a separate account for [the Carters] to cover the [p]romissory [n]ote [p]ayments." *Id.* at 4. Finally, the parties also included an integration clause in the Purchase Agreement specifying that "all of the promises, agreements, conditions, understandings, covenants, warranties and representations among the parties" were reflected in the agreement to the exclusion of any "prior agreements or understandings." *Id.* at 8. The parties entered into a separate agreement establishing the escrow account and requiring Urban Systems to deposit "approximately $900,000" into the account annually. Dkt. 11-13; *see also* Dkt. 11-18 at 5 (Carter Decl. ¶ 17).

Each of the three promissory notes ("Promissory Notes") took a similar form. Under the first, Urban Systems agreed to pay Richard Carter $1,032,246 plus interest, Dkt. 11-4 at 2; under the second, Urban Systems agreed to pay Jonita Carter $137,175 plus interest, Dkt. 11-5 at 2; and under the third, Keating promised to pay Jonita Carter $68,579 plus interest, Dkt. 11-6 at 2. Each provided for 58 consecutive monthly payments of principal and interest; each further reflected the same security interests granted in the Purchase Agreement; each included an acceleration clause in case of default; and each included the following language:

> This Note is payable without offset, and is subject to no other terms, conditions, defenses or offsets. No setoffs or counterclaims shall be asserted or brought by the Maker or any other party at any time liable hereunder in any suit or action for the collection of any sum due hereunder.

Dkt. 11-4 at 2, 4; Dkt. 11-5 at 2, 4; Dkt. 11-6 at 2, 4. An amortization schedule, reflecting the required payments of principal and interest, was attached to each note. Dkt. 11-4 at 6–8; Dkt. 11-5 at 6–8; Dkt. 11-6 at 6–8. The parties later agreed to modify the amortization schedules in minor respects. *See* Dkt. 11-7; Dkt. 11-8; Dkt. 11-9.

The three security agreements ("Security Agreements") also took a similar form. Under the first, Urban Systems granted Richard Carter a security interest in the shares the company redeemed from him and specified that, "[i]n the event of [d]efault," the company would "issue to [Richard Carter] the 59,951 shares of" the company's stock. Dkt. 11-10 at 2. Under the second, Urban Systems granted Jonita Carter a security interest in the shares it redeemed from her and specified that, "[i]n the event of [d]efault," the company would "issue to [Jonita Carter] 7,967 shares of" the company's stock. Dkt. 11-11 at 2. And, under the third, Keating granted Jonita Carter a security interest in (1) the shares that she transferred to him, (2) "all earnings attributable to th[ose] shares," and (3) "all proceeds attributable to the [s]hares." Dkt. 11-12 at 2.

C.      Post-Agreement Events

The parties anticipated that the profits Urban Systems would earn on the Grit Contract would be sufficient to pay the Carters the amounts due under the agreements described above. According to Keating, however, that expectation—and, in Keating's view, Carter's representations about the profitability of the contract—did not meet with reality. The parties differ about why this came to pass, but, for purposes of the Carters' motion for summary judgment, the Court must accept Keating's version of events. He points to a variety of factors.

First, Keating asserts that the wage, payroll tax, and employee benefit cost projections set forth in the spreadsheet that Carter gave him were inaccurate because they accounted for only one driver, even though "[i]t t[ook] two to three people to make the contract work to the satisfaction of D.C. Water." Dkt. 20 at 119. Previously, Carter had used personnel from his other company, Carter & Carter Inc., to "supervis[e] and assist[] on the Urban contract," but that labor cost was not reported in the spreadsheet. *Id.* at 144. Keating testified that he needed to spend "double" the amount projected in the spreadsheet on wages—about $140,000 in wages per year—in addition to incurring increased payroll taxes and benefits. *Id.* at 120–21.

Second, Keating contends that delivering the services required under the Grit Contract required more equipment than the company owned, resulting in additional expenses that were not included in the spreadsheet. When Keating acquired Urban Systems, it owned one vehicle, but, according to Keating, the company needed two vehicles to deliver the required services—"one that's running" and "one as a backup." *Id.* at 121–22; *see also id.* at 143 ("We needed additional equipment, because the equipment we had wasn't sufficient to do the job."). This, in turn, raised the company's insurance costs. *Id.* at 121–22. The equipment that Urban Systems did have, moreover, was in poor condition, requiring the company to spend "$60,000 on repairs, cleanup, maintenance, [and] getting the equipment back in shape." *Id.* at 122; *see also id.* at 143–44.

Third, and most significantly, the projections included in the spreadsheet vastly understated the costs that Urban Systems actually incurred in disposing of the grit. *Id.* at 123. According to Keating, the King & Queen facility—whose $18.50 per-ton disposal rate was the cornerstone of the cost projections—refused to accept Urban Systems' grit starting in March 2017, forcing the company to use more expensive disposal facilities to fulfill its obligations under the contract. *Id.* at 124–25, 163–64. One of those alternative facilities, the King George landfill, charged $68.50 per ton—over three and a half times as much as the King & Queen facility. *Id.* at 124.

Due to these unanticipated costs, the parties agreed to delay the first payment under the amortization schedule for two months "to give [Keating] two months of working capital so that [he] could get on top of it and perform the contract." *Id.* at 39; *see also id.* at 138 ("[W]e delayed the first payment . . . [because] already the costs were higher, the cash flow wasn't there."). Difficulties continued, however, and, at the end of 2016, Keating loaned the company $140,000 "to keep [it] afloat." *Id.* at 137. And, creating yet further debt, Urban Systems purchased equipment from Carter for $100,000 in April 2017, *id.* at 179–80, agreeing in that "Asset Purchase Agreement" to pay Carter for the equipment in monthly installments of $2,358.42, Dkt. 11-16 at 2–6; Dkt. 11-1 at 6 (Pls.' SUMF ¶¶ 28–29). With that additional undertaking, Carter and Urban Systems revised the amount due each month from the escrow account to an amount in excess of $25,000. Dkt. 11-16 at 2. In contrast, according to Keating, Urban Systems netted only about $40,000 under the Grit Contract in the entire year following the transaction—before making any payment to the Carters. *Id.* at 137.

By July or August 2017, Keating told Carter that Urban Systems "didn't have the cash to continue paying the note" and "asked him [to forego] the payment that month." *Id.* at 139–40.

Carter instead agreed to loan the company $20,000 for July and $15,000 for August.  *Id.* at 43.
But, according to Keating, even with this help, Urban Systems was still unable to make the
required payments to the Carters.  *Id.* at 140 ("[R]evenues were . . . around $40,000 [or] $45,000.
[Carter]'s taking $25,000 out right away to pay the note which left $20,000 to pay fuel, people,
landfill.").  In September 2017, Keating once again asked Carter for assistance, this time
requesting that he agree to "restructure the payments."  *Id.* at 147.  Carter rejected that request,
*id.*, but did pay a number of vendors a total of $14,739.30 on behalf of the company, subject to
Urban Systems' agreement—the "Vendor Payments Reimbursement Agreement"—to repay him
that amount, *see* Dkt. 1-15; Dkt. 11-17.

Finally, in December 2017, Keating instructed D.C. Water to stop depositing the
proceeds from the Grit Contract into the escrow account and thereby stopped making the
monthly payments to the Carters required under the various agreements discussed above.  Dkt.
20 at 52–53.  By then, Urban Systems had made sixteen payments under the Promissory Notes—
from September 2016 until December 2017—leaving substantial outstanding balances on the
three Promissory Notes.  Dkt. 11-1 at 4 (Pls.' SUMF ¶ 20); Dkt. 11-19; Dkt. 6-11 at 3 (asserting
that a total of $914,502.54 remains due on the three Promissory Notes).  According to the
Carters, Urban Systems has made nine payments under the Asset Purchase Agreement and
Vendor Payments Reimbursement Agreement, leaving $84,361.86 and $12,086.19 outstanding
on those agreements, respectively.  Dkt. 11-1 at 6 (Pls.' SUMF ¶¶ 32–33).

On February 2, 2018, the Carters notified Urban Systems and Keating that their monthly
payments were due under the Promissory Notes and that failure to make payment by February
17, 2018 would result in a default under the Notes.  Dkt. 11-14 at 2–3; Dkt. 11-1 at 5 (Pls.'
SUMF ¶ 22).  When Urban Systems and Keating failed to make payment, the Carters notified

them that they were in default and (1) demanded accelerated payment of the entire amount due under the Promissory Notes; (2) asserted that Keating's right to vote the shares that he received from Jonita Carter had "ceased;" and, finally, (3) demanded that Urban Systems transfer and assign to Richard Carter 59,951.75 shares in the company, and transfer and assign to Jonita Carter 7,967 shares in the company.  Dkt. 11-15 at 3–4.

Notwithstanding the Carters' demands, Keating has continued to operate and control Urban Systems, has not made the payments they demanded, and has not directed that Urban Systems reissue any shares to the Carters.  The evidence shows that he has, instead, directed his efforts to trying to make Urban Systems profitable, including by negotiating an increase in the disposal rate from D.C. Water, Dkt. 20 at 165, and attempting to develop additional revenue streams, *id.* at 159.

**D.      The Present Action**

Plaintiffs filed this action on March 20, 2018.  Among other relief, they seek payment from Urban Systems and Keating of the full amounts remaining due on the Promissory Notes; an injunction requiring Urban Systems to issue the shares as required by the Security Agreement and requiring Keating to assign his shares to Jonita Carter; payment of the amounts due on the Asset Purchase and Vendor Payments Reimbursement Agreements; a declaratory judgment; and their attorney's fees.  Dkt. 1 at 17–18 (Compl. Prayer).

Several weeks after filing suit, Plaintiffs filed a motion for a preliminary injunction.  Dkt. 6.  That motion focuses on only one portion of their case—their contention that Urban Systems should be required to issue the shares, and Keating should be required to assign his shares, as provided in the Security Agreements.  *Id.*  The Court ordered that the parties promptly appear for a scheduling conference and, at that conference and with the parties' concurrence, ordered that Plaintiffs file an expedited motion for summary judgment and that the parties appear for a

consolidated hearing on Plaintiffs' motions for a preliminary injunction and for summary judgment. *See* Dkt. 10. Urban Systems and Keating opposed both motions. With respect to Plaintiffs' motion for a preliminary injunction, they argued that Plaintiffs had failed to demonstrate irreparable injury and that they were unlikely to succeed on the merits because Richard Carter fraudulently induced Keating to enter into the various agreements. Dkt. 15 at 7–12. And, with respect to Plaintiffs' motion for summary judgment, they argued that the motion was premature because Defendants had not yet had an opportunity to conduct discovery and that, in any event, their fraudulent inducement defense gave rise to a genuine issue of material fact. Dkt. 14 at 7–8. In addition, Keating asserted a counterclaim against the Carters for fraudulent inducement and negligent misrepresentation. Dkt. 13 at 20–22.

On June 4 and June 7, 2018, the Court heard testimony and oral argument on Plaintiffs' motion for a preliminary injunction and motion for summary judgment. *See* Dkt. 20; Minute Entry (June 7, 2018). The Carters offered testimony from two witnesses: Richard Carter, the former owner and Chief Executive Officer of Urban Systems, and Eunice Liu, the former comptroller of Urban Systems. Urban Systems and Keating offered the testimony of William Keating. At the hearing, Urban Systems and Keating requested the opportunity to file a surreply to the Plaintiffs' motions, and the Court granted that request. Dkt. 20 at 199–200. Subsequently, Urban Systems and Keating moved to amend their Answer and Counterclaim to include the defense of mutual or unilateral mistake and to assert additional counterclaims for "innocent misrepresentation" and unjust enrichment, Dkt. 28-1 at 2–3, and the Court granted that motion, Minute Order (Aug. 8, 2018). Finally, on July 1, 2018, Urban Systems and Keating filed a supplemental Rule 56(d) declaration identifying additional discovery that they contend is

warranted before the Court decides whether Plaintiffs are entitled to summary judgment on some, or all, of their claims.  Dkt. 29-1.

## II.  LEGAL STANDARD

As discussed below, the Court resolves the pending motions under the summary judgment standard.  The moving party is entitled to summary judgment if he or she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).  The non-movant's opposition, however, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir.

1987).  If his or her evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Liberty Lobby*, 477 U.S. at 249–50.

### III.  ANALYSIS

Although the parties disagree about much, they agree that (1) the Carters sold their interests in Urban Systems for $1,238,000 to be paid in monthly installments over a period of nearly five years; (2) they executed the Purchase Agreement, Promissory Notes, Security Agreements, Escrow Agreement, Asset Purchase Agreement, and Vendor Payments Reimbursement Agreement; (3) Urban Systems and Keating made approximately sixteen payments pursuant to the Promissory Notes but, in December 2017, stopped funding the escrow account and stopped making payments on the Promissory Notes; (4) the Carters provided Urban Systems and Keating with notice that, if they failed to make the required payments by February 17, 2018, they would be in default; (5) after Urban Systems and Keating failed to make the required payments, the Carters notified them that were in default and demanded immediate payment of the entire amount due and the re-issuance or return of the secured shares of stock in Urban Systems; (6) neither Urban Systems nor Keating has complied with these demands; and, finally, (7) Urban Systems also stopped making payments under the Asset Purchase and Vendor Payments Reimbursement Agreements in January 2018.  *Compare* Dkt. 11-1 (Pls.' SUMF), *with* Dkt. 14-3 (Defs.' Response).

In the ordinary course, these undisputed facts might suffice to resolve the case; the parties agree that they executed the documents requiring payment and providing the security at issue, and they agree that Urban Systems and Keating have failed to make the required payments or to return the security.  According to Defendants, however, this case is not that simple.  In their view, Richard Carter fraudulently induced Keating to purchase Urban Systems, and that fraud

gives rise to both an affirmative defense and a counterclaim. Because fraudulent intent is an inherently fact-bound question, Defendants further contend, there exists a genuine dispute of material fact that precludes the grant of summary judgment or, at the very least, there exist ample grounds to permit them to take discovery before the Court resolves the motion. Dkt. 14 at 7–10; Dkt. 25 at 5–21. As explained below, the Court agrees that Keating's claim of fraudulent inducement turns on (potentially) disputed issues of material fact and, accordingly, cannot be resolved at this early stage of litigation. But that conclusion does not fully resolve Plaintiffs' pending motions, which—among other things—seek the immediate reissuance or return of their shares in the company.

The difficulty that Keating faces is captured by the tired but fitting aphorism that "you can't have your cake and eat it too." On the one hand, Keating wants to disavow the Purchase Agreement and related agreements as the product of fraud—at least to the extent those agreements require that he and Urban Systems pay the Carters or return their shares. But, on the other hand, he wants to affirm the agreements—at least to the extent they confer on him the status as sole shareholder in Urban Systems. The law does not afford him this luxury. Having affirmed the agreements by continuing to exercise his rights under them, he must abide by their remaining terms. To the extent he was the victim of fraud, his remedy does not lie in non-compliance with his obligations under the agreements, which he has affirmed, but in an action for damages.

For this reason, the Court concludes that Plaintiffs are entitled to summary judgment on Counts IV, V, and VI of their complaint, which allege that Urban Systems and Keating have materially breached the terms of the Security Agreements by failing to re-issue or assign the secured shares to the Plaintiffs. That decision, moreover, obviates the need to resolve Plaintiffs'

motion for a preliminary injunction, which seeks that same relief. In addition, as further explained below, the Court agrees that Plaintiffs have shown, without dispute, that they are entitled to summary judgment on Counts VII and IX, which allege that Urban Systems is in material breach of the Asset Purchase and Vendor Payments Reimbursement Agreements. In all other respects, however, the Court will deny Plaintiffs' motion for summary judgment on the ground that discovery and further factual development are appropriate before the Court decides what additional relief, if any, is appropriate.

## A.     Fraudulent Inducement

"Fraudulent inducement to enter a contract requires a misrepresentation or omission that pertains to an essential term of a contract and the intent to convince a [party] to enter the contract." *In re U.S. Office Prod. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 101 (D.D.C. 2003); *see also Haynes v. Kuder*, 591 A.2d 1286, 1290 n.5 (D.C. 1990). "[I]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." *Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1255 (D.C. 2018) (quoting Restatement (Second) of Contracts § 164 (1981) [hereinafter "Restatement"]); *see also King v. Indus. Bank of Wash.*, 474 A.2d 151, 155 (D.C. 1984) ("Misrepresentation by one party to a contract will not relieve the other party of his contractual obligation unless he relied on the misrepresentation and was induced by it to enter into the contract."). A fraudulent misrepresentation, in turn, is "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992); *see also Intelsat USA Sales Corp. v. Juch-Tech., Inc.*, 24 F. Supp. 3d 32, 46–47 (D.C. 2014). "[I]n cases . . . involving commercial contracts negotiated at arm's length," moreover, the "defrauded party's reliance

[must] be reasonable." *Id.* If each of these elements is satisfied, "the contract is voidable by the recipient," *Steiner*, 177 A.3d at 1256, and that party "may elect to avoid any legal obligations under the contract," *Schmidt v. Shah*, 696 F. Supp. 2d 44, 63 (D.D.C. 2010).[1]

Urban Systems and Keating argue that Carter (with help from Liu) fraudulently misrepresented the costs associated with performing the Grit Contract in multiple respects. Most notably, they assert that Carter provided Keating with a spreadsheet that concealed and understated the necessary wage, payroll tax, employee benefit, equipment, insurance, and disposal costs associated with the Grit Contract and that he later confirmed those same cost projections when Keating incorporated them into his own spreadsheet. Dkt. 14 at 4–5; Dkt. 25 at 8. They also assert, more generally, that Carter misrepresented to Keating that he would be able to purchase Urban Systems using only the profits from the Grit Contract and that Keating would enjoy "unprecedented [profit] margins" if he purchased the company. Dkt. 25 at 8–12. Although the Carters dispute the accuracy of this depiction of the relevant events, they do not press that factual dispute at this stage of the litigation. Instead, they offer two arguments that, they contend, dispose of Defendants' fraudulent inducement defense as a matter of law.

Plaintiffs first argue that Defendants' fraudulent inducement defense impermissibly relies on parol evidence. Dkt. 17 at 8–12. As Plaintiffs correctly observe, the parol evidence rule typically precludes parties to a written contract from varying the terms of that agreement through

---

[1] Defendants state that contracts that were fraudulently induced are "void or voidable." Dkt. 14 at 7; Dkt. 25 at 17. At least in the present circumstances, that is not correct; a fraudulently induced contract is voidable, not void. *See Schmidt*, 696 F. Supp. 2d at 63 ("[A] contract is voidable at the option of the innocent party if that party's assent was induced by a misrepresentation, whether fraudulent or innocent."); Restatement § 164 ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").

the use of extrinsic evidence.  In the words of the D.C. Court of Appeals: "A completely integrated contract may not be supplemented with prior representations not ultimately included therein, even if those representations are not expressly contradicted by the contract itself." *Hercules*, 613 A.2d at 928.  "[A] recital that the [contract] 'contains the entire agreement of the parties,'" moreover, "has traditionally been given effect 'as showing an intention that the agreement be [treated as] fully integrated.'"  *Id.* at 928 n.17 (quoting 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.3 at 205–06 (2d ed. 1990)); *see also Jacobsen v. Hofgard*, 168 F. Supp. 3d 187, 201 (D.D.C. 2016).  The parol evidence rule is "grounded in the inherent reliability of a writing as opposed to the memories of the contracting parties." *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (quoting *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 630 (4th Cir. 1977)).

The Purchase Agreement at issue here contains an integration clause that covers the Purchase Agreement itself as well as the Promissory Notes and the Security Agreements.  It provides:

> This agreement and the Exhibits [*i.e.*, the Promissory Notes and the Security Agreement] set forth all of the promises, agreements, conditions, understandings, covenants, warranties and representations among the parties hereto with respect to the subject matter referred to herein, and there are no promises, other than set forth herein.  Any and all prior agreements with respect to such subject matter are hereby revoked.  This Agreement is, and is intended by the parties to be, an integration of any and all prior agreements or understandings, oral or written, with respect to the subject matter.

Dkt. 11-3 at 8.  In Plaintiffs' view, this language, read in light of the parol evidence rule, precludes the Court from considering Defendants' fraudulent inducement defense.  The fraudulent inducement defense, in their view, turns on the premise that Carter promised Keating that Urban Systems would earn net profits on the Grit Contract even after making the required payments to the Carters.  And, because the parties' agreements contain no such promise and,

indeed, disavows any promise or representation not reflected in the agreements, the defense must fail. The Court is not convinced.

To be sure, the D.C. Circuit broadly declared in *One-O-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988), that "silence in a final agreement containing an integration clause—in the face of prior explicit representations—must be deemed an abandonment or excision of those earlier representations." *Id.* at 1287. But the D.C. Circuit later clarified in *Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995), that its conclusion in *One-O-One* "was plainly not intended to say that an integration clause bars fraud-in-the-inducement claims generally or confines them to claims of fraud in execution." *Id.* at 1258. To the contrary, "[s]uch a reading would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate." *Id.* The D.C. Court of Appeals, which of course has the final say on questions of D.C. law, moreover, has since agreed with the "general statement in *Whelan* that an integration clause does not provide a blanket exemption to claims of fraud in the inducement." *Drake v. McNair*, 993 A.2d 607, 624 (2010).

Both the D.C. Circuit and the D.C. Court of Appeals have reconciled any seeming tension between the *One-O-One* and *Whelan* decisions by distinguishing between "alleged prior representations that a party will or will not do something in the future that [is] not included in that written contract," and other representations that call into question whether an enforceable agreement was ever reached. *Id.*; *Whelan*, 48 F.3d at 1258. Plaintiffs do not resist this dichotomy but argue that the alleged representations at issue here related only to the future—that is, they related to the costs that Urban Systems would incur in the future in performing the Grit Contract. Dkt. 17 at 12. That characterization of the defense fails for two reasons.

First, in pressing their fraudulent inducement defense, Defendants are not arguing that Carter made a representation about something he would or would not do in the future. This is not a case, for example, in which Carter allegedly represented that he would not compete with Urban Systems and Keating, failed to include that term in the contract, and then submitted his own bid for the Grit Contract renewal. Second, although Keating was interested in the information for purposes of forecasting the costs that Urban Systems would incur, he alleges that Carter misled him about the costs that Urban Systems had incurred in the past and about what Carter's experience and then-existing knowledge—if fully disclosed—would have told him about the value of Urban Systems at the time of the acquisition. Keating asserts, for example, that at the time of the agreement, Carter knew that more than one employee would be needed to perform the contract and that, as a result, the cost projections for wages, employee benefits, and payroll taxes included in the spreadsheet were false and misleading. Carter also knew, according to Keating, that the Grit Contract could not be performed without additional equipment and that, as a result, the equipment, maintenance, and insurance cost projections included in the spreadsheet were false and misleading. And, according to Keating, Carter knew that the disposal costs included in the projection were lower than the costs that Urban Systems had, in fact, incurred, and that those costs projections, accordingly, were also false and misleading. This case, as a result, is readily distinguishable from those in which courts have held that an integration clause bars an assertion of fraudulent inducement on the basis of prior representations regarding a party's future conduct.[2]

---

[2] *See One-O-One*, 848 F.2d at 1285 (involving allegations of a promise that a party did not intend to sell or dispose of their interest in chain of restaurants); *Hercules*, 613 A.2d at 926 (involving representations that a party would deposit money into an account to satisfy obligations under the contract); *In re U.S. Office Prod. Co. Sec. Litig.*, 251 F. Supp. 2d at 102

Plaintiffs also argue that an integration clause "carries greater force when," as here, "the parties are sophisticated, represented by counsel, and had the opportunity to read and understand the contract at issue," *see* Dkt. 17 at 9, and, for similar reasons, that Keating could not have reasonably relied on the cost projections reflected in the spreadsheet, *id.* at 15–16. In support of these arguments, they point to the facts that Keating holds an MBA from Harvard Business School; that he was the President of Urban Systems up until a few years before the transaction and thus had firsthand knowledge about the relevant costs; that the negotiations took place over several weeks; and that the parties were represented by independent counsel. Dkt. 17 at 9–10; Dkt. 27 at 13–16. Although these facts are relevant to the question of fraudulent inducement, the Court cannot conclude—at this early stage of the litigation—that they establish that Defendants' fraudulent inducement defense (and, by implication, Keating's counterclaim) fails as a matter of law.

As an initial matter, it is unclear whether the parol evidence rule comes into play at all in this context. Because the parol evidence rule presupposes a valid contract, and a fraudulent inducement claim challenges the validity of the contract itself, courts generally conclude that the rule does not preclude evidence regarding a fraudulent inducement claim. *See Hercules*, 613 A.2d at 929 ("The parol evidence rule does not apply when a party to a contract alleges that parol representations were fraudulently made."); *see also Flippo Constr. Co., Inc. v. Mike Parks Diving Corp.*, 531 A.2d 263, 269 (D.C. 1987); *Stamenich v. Markovic*, 462 A.2d 452, 455 (D.C.

---

(involving representations with respect to the company's future business plan and leadership); *Bonfire, LLC v. Zacharia*, 251 F. Supp. 3d 47, 50, 54 (D.D.C. 2017) (involving a party's oral agreement to provide lessee with a right of first refusal to purchase property); *cf. Jacobsen*, 168 F. Supp. 3d at 204 (noting that "the alleged fraudulent representations and omissions at issue . . . do not concern promises by Defendants regarding their future behavior," and that "integration clauses do not necessarily bar such claims").

1983); *Giotis v. Lampkin*, 145 A.2d 779, 781 (D.C. 1958); *see also* Restatement § 214(d)

("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are

admissible . . . to establish . . . illegality, fraud, duress, mistake, lack of consideration, or other

invalidating cause."); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.4 at 245 (3d ed. 2004)

[hereinafter "*Farnsworth*"] ("It is generally agreed that the parol evidence rule does not bar

extrinsic evidence to show fraud as a ground for rescission, a tort action for damages, or

reformation.").  The explanation provided in *Farnsworth on Contracts* is instructive:

> If the parol evidence rule rests on the rationale that a later written agreement has
> supplanted prior negotiations, it follows that the rule does not come into play until
> the existence of an enforceable written agreement has been shown.  Evidence of the
> negotiations between the parties should therefore be admissible to show that no
> agreement was reached or that the agreement reached was invalid.  The parol
> evidence rule does not speak to these questions.  Even a merger clause should not
> preclude such a showing, since the effectiveness of the clause itself depends on its
> being part of a valid agreement.

2 *Farnsworth* § 7.4 at 240.  Not surprisingly, all the cases upon which the Carters rely for the

proposition that the parol evidence rule may bar evidence of fraudulent misrepresentation were

decided in the context of alleged promises of future conduct.  *See One-O-One*, 848 F.2d at 1288;

*Hercules*, 613 A.2d at 918–19; *In re U.S. Office Prod. Co. Sec. Litig.*, 251 F. Supp. 2d at 102;

*Bonfire*, 251 F. Supp. 3d at 50, 54.

In any event, whether Plaintiffs seek to use Keating's sophistication and background to

reinforce their contention that he is bound by the integration clause or, separately, to show that

he could not have reasonably relied on the cost projections included in the spreadsheet, their

argument turns on facts that require further development.  Plaintiffs, for example, posit that

because Keating previously served as President of Urban Systems, he must have known whether

the Grit Contract cost projections were reasonable, while Keating contends that he was not

personally involved in the day-to-day administration of the contract and that, in any event,

whatever knowledge he once had was either dated or forgotten by the time he acquired Urban Systems. *See* Dkt. 20 at 110–11, 186–87. Moreover, while the Carters contend that Keating was a sophisticated businessman capable of doing his own due diligence, Keating asserts that his relationship with Carter was akin to "father and son" and that he trusted and relied on Carter. *See id.* at 111–12; *id.* at 54. Given these and other factual questions, the Court cannot conclude as a matter of law, and without providing Defendants with an opportunity to take discovery, that Keating's reliance on Carter's alleged representations was unreasonable or that the integration clause forecloses any such reliance.

## B.    Affirmation

Plaintiffs argue that Defendants' fraudulent inducement defense fails for a second reason as well: even after learning about the alleged misrepresentations, neither Urban Systems nor Keating disavowed the relevant agreements, and they have continued to exercise all of their rights under the agreements without abiding by their obligations. Under these circumstances, Plaintiffs submit, Defendants' fraudulent inducement affirmative defense fails as a matter of law, and Keating's sole remedy lies in an action for damages. As explained below, the Court agrees.

Under D.C. law, if "a party to an executed contract discovers a material misrepresentation made in the execution of the contract, that party" faces a choice: he or she may "either [1] affirm the contract and sue for damages, or [2] repudiate the contract and recover that with which he or she has parted." *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001) (quoting *Dresser v. Sunderland Apartments Tenants Ass'n*, 465 A.2d 835, 840 (D.C. 1983)). The allegedly defrauded party, however, has made that choice—and cannot elect otherwise—when he "treats the property as his own and [thus] affirms the contract through continued performance." *Id.*; *see also Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1158 (D.C. Cir. 2007). Having implicitly elected to affirm the contract, the allegedly defrauded party is "precluded from suing for rescission."

*Dean*, 779 A.2d at 915. Or, in the words of the Restatement (Second) of Contracts, "[t]he power of a party to avoid a contract for mistake or misrepresentation is lost if[,] after he knows . . . of the misrepresentation[,] . . . he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance." Restatement § 380; *see also Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 55 (D.D.C. 2011) ("D.C. law provides that affirming a contract—continuing to carry it out—negates the opportunity to rescind."). In determining whether a party asserting a fraudulent inducement defense is precluded from seeking rescission, courts consider the party's "delay in disaffirming the contract" and whether the party "accept[ed] [the] benefits under the contract." *Goldstein v. S & A Rest. Corp.*, 622 F. Supp. 139, 145 (D.D.C. 1985); *see also* 1 *Farnsworth* § 4.15 at 496–98 ("Ratification may be express or by conduct inconsistent with avoidance, for example by the recipient's own use of property obtained under the contract as though it were the recipient's own. . . . [T]he recipient is also precluded from avoiding the contract by failing to disaffirm within a reasonable time after discovering the falsity of the representation.").

Here, the undisputed facts show that, even if Carter understated the costs that Urban Systems would incur in performing the Grit Contract, Keating was well aware of the actual costs of performance long before this dispute arose. On Keating's theory of the case, Carter fraudulently (or negligently) led him to believe that the revenue generated by the Grit Contract would be sufficient to cover the company's costs, to pay the Carters the amounts due under the Promissory Notes, and to still generate a net profit of "about $10,000" per month. Dkt. 20 at 136. But he also testified that, over the course of the entire first year of the contract, Urban Systems earned only $40,000 in profits *before* paying the Carters the amounts due under the Promissory Notes. Dkt. 20 at 137. And, even though Carter allegedly represented that Keating

could pay his sole stake in Urban Systems with the profits generated by the Grit Contract and that he would have "no skin in this deal," *id.* at 115, Keating testified that, by the end of 2016, he had to invest $140,000 in the company to "keep [it] afloat," *id.* at 137, and that he has now invested "approximately $230,000" total in the company, Dkt. 14-1 at 3 (Keating Decl. ¶ 19).

More generally, Keating has failed to identify *any* alleged misrepresentation that he did not discover long ago. He alleges, for example, that Carter understated the costs associated with the equipment and employees needed to perform the Grit Contract. But, by April 2016, he concluded that he needed to purchase additional equipment from Carter in order to perform. Dkt. 20 at 122; Dkt. 11-1 at 6 (Pls.' SUMF ¶¶ 28–29). In the first six months of the Grit Contract, Keating incurred substantial expenses relating to the maintenance of the equipment needed for the contract, Dkt. 20 at 116–17, as well as additional insurance costs, *id.* at 121–22. He also needed to hire additional personnel, and thus incurred labor costs far in excess of the costs reflected in the spreadsheet. *Id.* at 120–21. Furthermore, and perhaps most significantly, he quickly learned that his actual disposal costs were substantially higher—as much as three and a half times higher—than those included in the spreadsheets. *Id.* at 124–25, 139.

Nor is there any dispute that Keating was aware that he had been "misl[e]d" before he directed that D.C. Water stop making payments into the escrow account. *See* Dkt. 14-1 at 3 (Keating Decl. ¶ 17). He testified that, "in the fall of 2016, things didn't look right" and that, "obviously[,] [Carter's] numbers weren't correct and there was more expense." Dkt. 20 at 146. Most significantly, Keating's own declaration in this case attests that, "after operating the [c]ompany for a while," he "realized that [he] had been completely misl[e]d as to the expenses associated with serving the [Grit] Contract" and that Urban Systems "could not service [that]

[c]ontract at anywhere near the level of costs" Carter had represented in order "to induce [him] to buy the [c]ompany."  Dkt. 14-1 at 3 (Keating Decl. ¶ 17).

Even though Keating was aware that Urban Systems' actual costs were substantially higher than the costs included in Carter's spreadsheet, and even though he believed that Carter had "misled" him, Keating continued to perform under the agreements for over a year and a half—from April 2016 through December 2017.  Dkt. 20 at 146 ("But I kept pushing to try to make the company work, you know, figure out how we could get to the numbers that were at least profitable, at least enough to cover this note.").  He agreed to various allonges to the Promissory Notes that "expressly approved, ratified, and confirmed" those agreements.  *See* Dkt. 11-7 at 2; Dkt. 11-8 at 2; Dkt. 11-9 at 2.  To this day, moreover, he has continued to "reap the benefits" of the contract, *Goldstein*, 622 F. Supp. at 145, and to exercise control over the "property obtained under the contract as though it were [his] own," 1 *Farnsworth* § 4.15 at 496.

Defendants do not dispute these facts or contest that, as a general matter, a party alleging fraudulent inducement, who nonetheless continues to retain the benefits of the contract, has implicitly affirmed the contract and, as a result, may only sue for damages.  Instead, they merely contend that, for three related reasons, it is too early to put Defendants to the choice of affirming or repudiating the agreements.  None of these arguments is persuasive.

Defendants first argue that, "even as of the filing of this case, less than two years after [Keating] purchas[ed] the [c]ompany, . . . Keating cannot fairly be said to have 'full knowledge' of the fact that [Carter] defrauded him."  Dkt. 25 at 20.  That proposition, however, proves either too little or too much.  If Defendants mean that Keating was unaware that he was misled, that assertion is at odds with own declaration, which attests that he realized that he had been "misl[e]d" "after operating the [c]ompany for a while" and realized that "Carter intentionally

gave [him] the false impression that the spreadsheet accurately reflected the actual historical costs and performance of" Urban Systems "under the [Grit] Contract." Dkt. 14-1 at 2–3 (Keating Decl. ¶¶ 13, 17). Even if Keating only came to see Carter's actions in this clear light after the Carters brought this suit, he has now had ample time to decide whether to repudiate the agreements, and he has continued to exercise control over the property—that is, sole ownership of Urban Systems—that he acquired under those agreements.

On the other hand, if Defendants mean that a party to a contract cannot be put to the test of affirming or repudiating that contract until he has had the opportunity to obtain *all* relevant evidence in discovery, that proves too much. As an initial matter, it bears emphasis that, the governing case law does not turn on the potentially repudiating party's discovery of a fraud but on his "discover[y] [of] a material misrepresentation." *Dean*, 779 A.2d at 915 (quoting *Dresser*, 485 A.2d at 840). That approach, moreover, makes sense because a contract is voidable in cases of either fraud or material *misrepresentation*, and thus the Restatement (Second) of Contracts provides that the power to avoid a contract is lost if, after learning of the "*misrepresentation*"— regardless of whether the misrepresentation was intentional or negligent—the potentially repudiating party "manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance." Restatement § 380(2) (emphasis added). But the Court need not go that far to reject Defendants' contention that a party only loses the power of avoidance after obtaining "full knowledge" of the alleged fraud. Nothing in the case law or commentary supports such an expansive view of the power to repudiate a contract, and Defendants' approach would, as a practical matter, invite disenchanted buyers to continue to extract the benefit of their bargain while declining to perform their own obligations.

Defendants' second argument is simply a variant of their first.  They assert that the Federal Rules of Civil Procedure permit a defendant to plead in the alternative, and, here, they are merely exercising their right to seek the alternative remedies of (1) rescission or (2) affirmation and damages.  Dkt. 25 at 21–22.  But pleadings are one thing, actions are another.  Defendants do not dispute that they have continued to "treat[] the property [at issue] as [their] own," and, under settled law, that precludes them "from seeking rescission."  *Dean*, 779 A.2d at 915.  Nothing in the case law even hints at the proposition that a party alleging fraudulent inducement should be allowed to exercise control over the property bargained for in the contract, refuse to make any payment for that property, and then wait for the completion of the litigation—perhaps years later—to decide whether to repudiate or to affirm the contract.

Third, Defendants contend that entry of summary judgment is premature because they have not had the opportunity to conduct discovery.  In support of that contention, they have submitted two declarations pursuant to Federal Rule of Civil Procedure 56(d).  The first asserts that Defendants cannot adequately respond to Plaintiffs' motion for summary judgment without "financial records reflecting the historical costs associated with" the Grit Contract, the opportunity to depose Liu and/or Carter about how the spreadsheets were prepared, and the opportunity to conduct a 30(b)(6) deposition of a company representative about Urban Systems' historic costs.[3]  Dkt. 14-2 at 1.  The second provides additional detail and also seeks discovery regarding Carter and Liu's state of mind.  *See* Dkt. 29-1.  Much of the potential discovery Defendants identify may be relevant to Keating's counterclaims.  But Defendants have failed to show "why those facts are necessary" for purposes of responding to Plaintiffs' pending motion

---

[3]  The Court assumes that this final request is simply a mistake given that Defendants currently control Urban Systems and thus have access to any current Urban Systems witness.

for summary judgment. *U.S. ex. rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014); *see also Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). For purposes of that motion, the Court can assume that Carter induced Keating to enter into the agreements based on material misrepresentations and that he did so with an intent to mislead. Yet, even if that were the case—and the Court is in no position to express a view on that question—it would make no difference to the Court's resolution of the pending motion. The Court's decision turns on the *undisputed* facts that Keating has long been aware of Carter's alleged misrepresentations and, along with Urban Systems, has nonetheless declined to repudiate the agreements. Nothing that Defendants identify in their Rule 56(d) declarations would affect that decision.[4]

One final point bears on Plaintiffs' motion for summary judgment with respect to Counts IV, V and VI. Although Defendants have only indirectly touched on the point, one can imagine an argument that the Defendants were not required to make the missed payments under the Promissory Notes because Carter was liable to them for the damages they incurred due to his

---

[4] After briefing on the motion for a preliminary injunction and motion for summary judgment was completed, Defendants moved to amend their answer to add an affirmative defense of mistake, Dkt. 28-1 at 2–3, and they now assert that they "could . . . obtain rescission under" that new affirmative defense, Dkt. 25 at 22. There is no reason that Defendants could not have raised this additional argument in their opposition to Plaintiffs' motion for summary judgment and, for that reason, the argument is waived. But, even if the Court were to consider the defense, it would not change the result: Defendants are precluded from seeking rescission based on their mistake defense for the same reasons as they are precluded from seeking rescission based on their fraudulent inducement defense. *See Sununu*, 792 F. Supp. 2d at 56; *see also Grymes v. Sanders*, 93 U.S. 55, 62 (1876) ("Where a party desires to rescind upon the ground of mistake or fraud, he must, upon discovery of the facts, at once announce his purpose, and adhere to it."); Restatement § 380 ("The power of a party to avoid a contract for mistake or misrepresentation is lost if after he knows . . . of the misrepresentation . . . he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance."); 2 *Farnsworth* § 9.3 at 610 ("As in the case of misrepresentation, the party entitled to avoid for mistake may be barred by failing to act within a reasonable length of time after that party is or ought to be aware of the facts.").

alleged misrepresentations, and they were entitled to reduce the amounts due to Plaintiffs—to zero—in order to offset those amounts. That contention fails, however, for the same reasons discussed above. Because Defendants have not repudiated the agreements, the agreements remain in place—subject to Keating's counterclaims for damages. Each of the Promissory Notes, moreover, provides that the note "is payable without offset." Dkt. 11-4 at 4; Dkt. 11-5 at 4; Dkt. 11-6 at 4. As a result, Defendants cannot defend against their non-payment under the Promissory Notes based on an offset, and thus their failure to make any payments since December 2017 means that they are in default.

## C.      Asset Purchase and Vendor Payments Reimbursement Agreements

Plaintiffs also move for summary judgment on Counts VII and VIII of the complaint, alleging that Urban Systems is in material breach of the Asset Purchase and Vendor Payments Reimbursement Agreements. Dkt. 11-2 at 16–17. Defendants, in turn, do not dispute that they have failed to pay the sums owed under the Asset Purchase Agreement or Vendor Payments Reimbursement Agreement, *compare* Dkt. 1 (Compl. ¶¶ 52–63) *and* Dkt. 11-1 (Pls.' SUMF ¶¶ 28–34), *with* Dkt. 13 (Countercl. & Answer ¶¶ 52–63) *and* Dkt. 14-3 (Defs.' SUMF ¶¶ 28–34), and they fail to raise any defense with respect to these claims. Because the relevant facts are undisputed and support a finding of breach, the Court is satisfied that Plaintiffs are entitled to summary judgment on Counts VII and VIII. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (2016). The Court will, accordingly, award Plaintiffs compensatory damages against Urban Systems in the amount of $84,361.86, plus interest, for the Asset Purchase Agreement; and $12,086.19, for the Vendor Payments Reimbursement Agreement.

**D.      Motion for Preliminary Injunction**

Because the Court has granted the Carters the relief they seek in deciding the motion for summary judgment, Plaintiffs' motion for a preliminary injunction is moot.

**CONCLUSION**

For the reasons set forth above, the Court will grant in part Plaintiffs' motion for expedited summary judgment, Dkt. 11, and will deny Plaintiffs' motion for a preliminary injunction as moot.  A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  August 13, 2018